**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| WAYNE BETTENCOURT, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BENCHMARK REALTY, LLC,<br><br>Defendant. | Case No. ____________________<br><br>Judge ______________________<br><br>CLASS ACTION<br><br>JURY DEMAND |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Wayne Bettencourt ("Plaintiff" or "Mr. Bettencourt"), individually and on behalf of all others similarly situated, by and through undersigned counsel, files this Class Action Complaint against Defendant Benchmark Realty, LLC ("Benchmark" or "Defendant"), and alleges as follows. Plaintiff's allegations are based on personal knowledge as to himself and his own transaction, and on information and belief, including the investigation of counsel, as to all other matters.

**INTRODUCTION**

1. This case is about a $320 fee that Benchmark charged Mr. Bettencourt, its own buyer client, for nothing. The fee had no service behind it, no cost behind it, and no name that accurately describes it. It is money taken from a client by the broker who was supposed to be looking out for him. Not content with the substantial, percentage-based commission of $12,600 it received for its role as the buyer's broker in Mr. Bettencourt's purchase, which the seller paid in full at closing, Benchmark also collected a flat $320 "Admin Fee" from Mr. Bettencourt himself.

2. The Closing Disclosure for Mr. Bettencourt's purchase tells the whole story. In Section H, "Other," it shows the seller paying, at closing, a "Real Estate Commission to Buyer's Agent: Benchmark" of $12,600.00, which is 2.5 percent of the $504,000 purchase price. On the line directly above, in the borrower-paid column, it shows a separate $320.00 charge to Mr. Bettencourt, the buyer, described as "Real Estate Agent Admin Fee to BENCHMARK REALTY" (the "Admin Fee"). The Admin Fee is an unfair and deceptive practice under the Tennessee Consumer Protection Act of 1977, for four reasons.

3. First, the Admin Fee was charged to the wrong party. A buyer's broker is customarily paid in full by the seller in United States housing transactions, and that is exactly what happened here: the seller paid Defendant's full buyer-broker commission. Yet Defendant, despite its relationship of trust with Mr. Bettencourt, carved out an additional $320 and assigned it to its own client. On information and belief, Defendant's policy and practice is to make no effort whatsoever to recover the Admin Fee from the seller, likely because no seller would agree to such double-dipping by a buyer's broker.

4. Second, the Admin Fee is a fee for no additional service, a fee for nothing, the prototypical "junk fee." Benchmark was fully compensated for its services by the $12,600 commission it received. That commission already paid Benchmark for everything it did for Mr. Bettencourt: identifying and showing homes, advising on and negotiating the purchase, and preparing the transaction paperwork that is part of the brokerage service and that Tennessee law requires of every licensed broker. The remaining work of the closing, the settlement, the title work, and the recording, was done by the settlement agent, Metropolitan Escrow, Inc., which Mr. Bettencourt paid separately, line by line, on the very same Closing Disclosure. There was nothing left for $320 to buy.

5. Third, on information and belief, the Admin Fee is not negotiable. On information and belief, Benchmark has a pattern and practice of affixing the same flat fee to every transaction it brokers for a buyer, and the fee cannot be removed or changed.

6. Fourth, the Admin Fee is labeled to obscure what it is. The label "Admin Fee" identifies no service, because there is none. It suggests a charge for some discrete administrative task performed for the buyer, when in fact it is simply additional compensation to the buyer's own broker on top of the full commission the seller was paying. Brokerages across the industry unlawfully charge the same add-on fee under other names (for instance, a "Broker Fee," a "Broker Commission," a "Compliance Fee," a "Selling Agent Broker Fee," a "Transaction Coordinator Fee," or a "Transaction Fee"), which confirms that the label is interchangeable and the fee is the same.

7. Federal regulators and policymakers have identified fees like this one as junk fees. The Tennessee Consumer Protection Act of 1977, Tenn. Code Ann. §§ 47-18-101 *et seq.*, declares unlawful specified "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," Tenn. Code Ann. § 47-18-104(a), and authorizes a consumer who suffers an ascertainable loss as a result to recover actual damages, up to three times actual damages for a willful or knowing violation, reasonable attorney's fees and costs, and such other relief as the court considers necessary and proper. A broker that charges its own client a fee for nothing, under a label that misrepresents what it is, engages in precisely such a practice. Plaintiff brings this action on behalf of himself and a class of Tennessee home buyers whom Benchmark charged the same fee, and seeks return of the fees, actual and treble damages, injunctive relief, and the other relief set forth below.

## PARTIES

8. Plaintiff Wayne Bettencourt is a natural person and an adult citizen of the State of Tennessee. On or about June 20, 2023, Mr. Bettencourt, together with co-purchaser Robert Ethier, closed on the purchase of a residence located in Elmwood, Tennessee, in Smith County (the "Property"), at which time Defendant charged him the $320 Admin Fee at issue. Mr. Bettencourt purchased the Property for personal, family, or household purposes.

9. Defendant Benchmark Realty, LLC is a Tennessee limited liability company and licensed real estate brokerage with its principal office at 2500 21st Avenue South, No. 102, Nashville, Tennessee 37212. The Closing Disclosure for Mr. Bettencourt's purchase identifies Benchmark Realty, LLC, Tennessee License ID 262297, as the buyer's real estate broker in the transaction, and identifies "BENCHMARK REALTY" as the payee of the Admin Fee and "Benchmark" as the recipient of the buyer-broker commission. Benchmark may be served through its registered agent as reflected in the records of the Tennessee Secretary of State. For purposes of 28 U.S.C. § 1332(d)(10), Benchmark is a citizen of Tennessee, the State under whose laws it is organized and in which it has its principal place of business.

10. At all relevant times, Benchmark acted through its affiliated licensees, agents, employees, and closing personnel, each of whom acted within the scope of that relationship, and Benchmark is responsible for their conduct.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because (a) this is a class action in which the proposed Class consists of more than 100 members; (b) the matter in controversy, aggregating the claims of all Class members and including actual damages, treble damages under Tenn. Code

Ann. § 47-18-109(a)(3), the value of the injunctive relief sought, and attorney's fees, exceeds $5,000,000, exclusive of interest and costs; and (c) at least one member of the Class is a citizen of a State different from Defendant.

12. On information and belief, Benchmark is among the largest residential real estate brokerages in Tennessee and represents buyers in thousands of Tennessee residential purchases each year, in each of which it charges the Admin Fee or a similar flat fee. According to its website, Benchmark maintains multiple brokerage offices throughout Tennessee, Kentucky, and Alabama. Over the Class Period, the fees collected from Class members, trebled, together with the value of the injunctive relief and attorney's fees sought, exceed $5,000,000.

13. This Court has personal jurisdiction over Defendant because Defendant is organized under the laws of Tennessee, maintains its principal place of business in Tennessee, is licensed to and does conduct real estate brokerage business in Tennessee, and committed the acts alleged herein in Tennessee.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendant resides in this District, maintaining its principal office in Nashville, Davidson County, and because a substantial part of the events giving rise to Plaintiff's claim occurred in this District.

15. All conditions precedent to the filing of this action have occurred, have been performed, or have been waived.

## FACTUAL ALLEGATIONS

### A. The Seller Paid Defendant's Full Buyer-Broker Commission, Yet Defendant Separately Charged Its Own Client a Flat Add-On Fee at Closing

16. Residential real estate in the United States is bought and sold almost entirely through licensed brokers. Brokers employ or affiliate with licensed agents who act on the broker's

behalf. In Tennessee, brokers and affiliate brokers must be licensed by the Tennessee Real Estate Commission and are subject to the licensing, conduct, and disclosure requirements of the Tennessee Real Estate Broker License Act of 1973, Tenn. Code Ann. §§ 62-13-101 *et seq.*

17. A typical home sale involves two brokers: a listing broker, who represents the seller, and a buyer's broker, who represents the buyer. Under Tennessee law, every licensee owes all parties to a transaction duties that include diligently exercising reasonable skill and care and providing services with honesty and good faith, Tenn. Code Ann. § 62-13-403, and a licensee who has agreed to represent a client owes that client additional duties, including the duty to be loyal to the interests of the client, Tenn. Code Ann. § 62-13-404.

18. Brokers for buyers of real estate in the United States are generally paid by the seller as part of the purchase. The "commission" a buyer's broker receives is negotiable, and it covers the entirety of the services the brokerage provides to the buyer: locating and showing properties, advising on and preparing offers, negotiating with the seller, preparing and processing the transaction paperwork, complying with the brokerage's own licensing and record-keeping obligations, and coordinating inspections, financing, and closing. There is no service a buyer's broker renders to its client that the commission does not pay for.

19. For decades, it has been customary on virtually all residential transactions in this country for the seller to pay the buyer's broker's commission, leaving the buyer with no brokerage costs. Commissions were typically five to six percent of the sale price, paid by the seller at closing and divided between the listing broker and the buyer's broker. Buyers understood, correctly, that their broker's services cost them nothing out of pocket. Nationwide antitrust litigation and a series of settlements effective in August 2024 later changed how buyer-broker compensation is offered, by removing it from the multiple listing service and requiring buyer's brokers to obtain written

agreements stating what the buyer will pay. The custom itself has not changed: sellers continue to pay buyer's brokers in the great majority of transactions, and buyers continue to expect that they will. At the time of Mr. Bettencourt's June 2023 purchase, that custom was in full force, and the seller in Mr. Bettencourt's transaction followed it.

20. In 2023, Mr. Bettencourt engaged Defendant as his buyer's broker in connection with the purchase of the Property, and Defendant agreed to represent him.

21. Mr. Bettencourt reasonably understood that Defendant's compensation for representing him would be the commission customarily paid by the seller, and that the seller would be paying it, as is customary.

22. Mr. Bettencourt purchased the Property from the seller, Jacqueline Danielle Huffines, for a sale price of $504,000, financed in part by a $378,000 purchase-money loan from New American Funding, LLC. The transaction was scheduled to close, and funds to be disbursed, on June 20, 2023, through Metropolitan Escrow, Inc. of Nashville, Tennessee (the "Settlement Agent"), under File No. 23-0248, as reflected on the Closing Disclosure for the transaction (the "Closing Disclosure"), which Mr. Bettencourt acknowledged receiving on June 2, 2023. Mr. Bettencourt paid a $10,500 earnest money deposit and was to bring $124,905.80 in cash to closing.

23. Consistent with custom, the Closing Disclosure shows real estate commissions totaling $25,200.00, or 5.0 percent of the purchase price, paid entirely from the seller's funds at closing, and divided equally: $12,600.00 (2.5 percent) to the seller's agent, Heartland Real Estate & Auction, Inc., and $12,600.00 (2.5 percent) as the "Real Estate Commission to Buyer's Agent: Benchmark." By Defendant's own accounting, $12,600 was the complete price of the brokerage services Defendant rendered to Mr. Bettencourt.

24. The Closing Disclosure (attached hereto as Exhibit A) nonetheless charged Mr. Bettencourt, the buyer, a separate $320.00 amount, payable from the borrower's funds at closing, on line 01 of Section H, "Other," described as:

> 01 Real Estate Agent Admin Fee to BENCHMARK REALTY . . .
> $320.00

25. This means that Defendant collected total compensation of $12,920 on the transaction, with $320 of that amount charged to its own client on top of the full commission the seller paid. Mr. Bettencourt paid the Admin Fee out of the money he brought to closing. He had no practical alternative. The fee appeared on the closing documents for a home he had contracted to buy, with his $10,500 earnest money deposit at risk and his financing locked. A buyer in that position does not refuse to close over $320, even if that amount is a deceptively obtained cash grab.

### B. Defendant Owed Plaintiff Duties of Loyalty and Honesty, but Did Not Have the Seller Pay Its Add-On Fee, Likely Because No Seller Would Agree to Such Double Dipping

26. A buyer's broker customarily is paid in full by the seller in United States housing transactions, and Mr. Bettencourt reasonably understood that to be the case here. The seller in fact paid Defendant's full 2.5 percent buyer-broker commission. Defendant nonetheless charged the Admin Fee to Mr. Bettencourt.

27. As the party negotiating the purchase on Mr. Bettencourt's behalf, Defendant had both the authority and the means to ask the seller to pay the Admin Fee along with the rest of Defendant's compensation, or to credit the seller's $12,600 payment against it. The seller was already paying Defendant $12,600 at the same closing. Defendant did not seek the additional $320 from the seller, did not credit any part of the seller's payment against the Admin Fee, and did not waive the Admin Fee. It charged the Admin Fee to its own client instead.

28. On information and belief, Defendant's policy and practice is to make no effort to recover the Admin Fee from the seller in any transaction, likely because no seller, already paying a full buyer-broker commission of thousands of dollars, would agree to pay a second, flat charge to the same broker for the same transaction. Such double dipping can be achieved only where the person paying it is Defendant's own client, who has been told or led to believe the fee is required, who cannot practically refuse it at closing, and who is therefore the perfect candidate to charge a junk fee on.

29. The Admin Fee is thus a fee charged by a broker to its own client. Defendant was not a stranger selling Mr. Bettencourt a product across a counter. On information and belief, Defendant agreed to represent Mr. Bettencourt as his broker and therefore owed him the duties a licensee owes its client under Tennessee law, including the duty to be loyal to his interests, Tenn. Code Ann. § 62-13-404, in addition to the duties of reasonable skill and care, honesty, and good faith that a licensee owes every party to a transaction, Tenn. Code Ann. § 62-13-403.

30. A broker that takes a fee from its own client for nothing, describes it in a way that misrepresents its nature, treats it as mandatory, and makes no effort to have the party that customarily pays broker compensation pay it, violates those duties and offends the public policy of Tennessee's real estate licensing statute. That public policy informs whether Defendant's practice is unfair and deceptive under the Tennessee Consumer Protection Act.

### C. The Admin Fee Is Not Negotiable, Contrary to the Nature of Broker Compensation

31. Broker compensation is a matter of negotiation between the broker and its client. Commissions are not set by law, and the amount a broker charges is a term the client is entitled to bargain over.

32. On information and belief, the Admin Fee is not negotiable, and Defendant instructs its agents to treat it as non-negotiable.

33. On information and belief, Defendant instructs its agents to include the Admin Fee in every buyer transaction and to tell buyers who ask about it that it is mandatory and cannot be removed, and, if pressed, that it is for "paperwork," "compliance," or some similar administrative purpose.

34. A set fee that Defendant's agents are required to include is a fee set by Defendant and imposed on every buyer its agents represent. A fee presented as a component of negotiable broker compensation, but that the broker in fact will not negotiate, is a fee imposed through deception.

35. On information and belief, Defendant charges a flat Admin Fee to every buyer it represents, instructs its agents to include it, and ensures through its closing personnel that the fee appears on the closing documents of every purchase it brokers. On information and belief, Defendant does not permit its agents to waive the fee, and no service is rendered for it in any transaction.

36. Because Defendant applies the same practice at every closing, the facts of Mr. Bettencourt's transaction apply uniformly to every member of the proposed Class. Whether the Admin Fee pays for any service, whether Defendant's collection of it from its own clients is unfair and deceptive, and whether its labeling of the fee is misleading, are questions that can be answered for every Class member from Defendant's own forms, its own records and closing documents, and the testimony of its own agents.

## D. The Admin Fee Is for No Added Service Not Already Covered by the Commission, and Is Therefore Double Dipping

37. Benchmark was already receiving a commission, in a negotiated and expressly disclosed percentage amount, for all of the services it provided to Mr. Bettencourt: $12,600, paid by the seller. Every service Defendant rendered to Mr. Bettencourt, including showing homes, advising on offers, negotiating with the seller, and coordinating inspections and closing, was the service its commission compensated. Defendant has never identified any service the Admin Fee paid for that the commission did not.

38. An "admin" fee is, by its own name, an administrative fee, the same charge that brokerages across the country impose under the names "administrative," "transaction," "processing," and "document" fee. It describes the cost of operating a brokerage, which the commission pays for.

39. The fee is also belied by the Closing Disclosure, which shows that Defendant did not do the closing work, much less $320 worth of it. The closing was conducted by the Settlement Agent, to which Mr. Bettencourt separately paid a $500.00 "Title - Settlement" fee and a $500.00 "Title - Title Search/Abstract" fee, together with charges for lender's and owner's title insurance, and Mr. Bettencourt separately paid $128.00 in recording fees and $1,864.80 in transfer taxes. Mr. Bettencourt paid for the closing work, and paid the parties that performed it.

40. What remains is Defendant's own paperwork: its brokerage agreement, the agency and other disclosures Tennessee law requires, the purchase contract, and the transaction file Defendant keeps. Preparing those documents is not a service to the client that stands apart from brokerage; it is brokerage. Brokerage is what the buyer-broker commission compensates. It is also Defendant's own legal obligation. Tennessee law requires licensees to make written disclosures of their agency status and requires brokers to preserve their transaction records. *See* Tenn. Code Ann.

§§ 62-13-405, 62-13-312(b)(6). A licensed broker cannot charge its client a separate fee for complying with the statute that licenses it.

41. Charging a client a second time for work the commission already paid for is double dipping. That is what the Admin Fee is.

**E. The Admin Fee Is Labeled to Obscure Its Nature, and It Is a Junk Fee**

42. Defendant's actual commission, the compensation for its services, was the $12,600 the seller paid. The $320 was something else: a fixed surcharge, set without regard to the price of the home or the work involved, dressed in neutral, administrative vocabulary so that it would pass unnoticed alongside legitimate closing costs. Defendant called it a "Real Estate Agent Admin Fee."

43. The label conveys that the buyer is paying for some administrative service distinct from brokerage, rather than additional compensation to the buyer's own broker on top of the commission the seller was paying. And the fee was presented differently from the broker compensation. The Closing Disclosure shows both brokers' commissions as seller-paid charges, the buyer's broker's commission described as a "Real Estate Commission to Buyer's Agent." The Admin Fee, by contrast, appears in the borrower-paid column, under a different label and a different payee name, among Mr. Bettencourt's other closing costs, where a buyer reviewing the statement would take it for one more ordinary closing charge rather than as a second payment to his broker.

44. The fee is charged for nothing, and the Closing Disclosure shows it. The statement separately lists Defendant's commission, $12,600. That is the price set for the whole of Defendant's brokerage service: finding the property, advising the client, negotiating the purchase, and shepherding the transaction to closing. The $320 is, by the structure of the Closing Disclosure itself, something other than compensation for that service. Defendant has never identified, and

cannot identify, any service the $320 paid for that the $12,600 did not. A fee that purchases nothing is the definition of an unfair charge.

45. Defendant's practice is not unique. Brokerages across the country are engaged in a disturbing pattern of hiding and mislabeling the same junk fee under different names. Keller Williams market centers, for example, charge such fees under a variety of labels: Keller Williams Elite, in Pennsylvania, charges buyers a $650 "Broker Fee"; Keller Williams Classic Realty, in Minnesota, charges buyers a $499 "Broker Commission," which becomes an "Additional Broker Commission" by closing; Keller Williams Lakeside, in Michigan, charges buyers a $395 "Compliance Fee"; Keller Williams Realty Southwest, in Nevada, charged buyers a $595 "Selling Agent Broker Fee"; Keller Williams Realty Services, in Louisiana, charges clients a $599 "Transaction Coordinator Fee"; and a Keller Williams Realty brokerage in Delaware charged a buyer a $295 "Admin fee" and a $125 "Additional Commission." Defendant charged Mr. Bettencourt a $320 "Admin Fee." The fact that the same fee bears a different name and a different amount at every brokerage that charges it is itself evidence that the fee is entirely made up and not reflective of any service actually provided: a fee that paid for an actual service would have a name that described the service and a price that reflected its cost.

46. Recent investigative reporting has revealed that these unlawful fee practices are widespread and ongoing. In 2026, the Consumer Policy Center, a nonprofit consumer research organization, published a report titled "'Junk' Fees Charged to Both Home Sellers and Buyers: An Overview" (the "CPC Report"). The CPC Report is the most comprehensive public examination to date of a practice that has quietly spread through the residential brokerage industry: the imposition of flat, fixed-dollar fees on home buyers and sellers, on top of the percentage commissions they already pay, for no additional service.

47. The CPC Report describes how these fees are imposed by brokerages or their agents on home sellers or buyers in addition to a percentage-based commission. The fees typically range from $200 to $2,000, and occur under a variety of names, including "administrative," "transaction," "compliance," "regulatory," "processing," "technology," "document," and "coordinator" fees.

48. Drawing on interviews with brokers, agents, and industry participants, and on public discussion among agents themselves, the CPC Report concluded that the fees are charged by a substantial share of brokerages nationally and that franchise operations are especially likely to assess them. The decision to charge the fee is usually made at the brokerage level, and the CPC Report found that even where a brokerage does not charge one, individual agents sometimes add a flat fee anyway.

49. The CPC Report discovered that these fees are not, in fact, tied to any service. Brokers who tried to justify the fees by pointing to rising costs "received little sympathy" from the agents who have to explain them to clients. One agent revealed to clients the fee was simply "a way to increase profit for the corporation"; another called the extra charge "pure gravy" for the brokerage. Agents quoted in the report described the fee as "ticky tack," "bogus," "garbage," and a "money grab." The report's advice to consumers who find such a fee in a contract is to "ask why the percentage commission does not cover this cost."

50. The CPC Report found that these fees are often disguised. It described a practice, dating back more than fifteen years, of brokerages relabeling the fee to insulate it from challenge. It quoted one agent's 2010 observation that "many companies, mine included, have stopped charging the 'admin fee' and now claim that the commission is $x as a base plus x%." It further reported: "Increasingly, according to one expert, the fees on the forms are included as part of the

commission – e.g., 3 percent of sales price plus $500 fee." That is Defendant's practice exactly: a percentage commission plus a flat $320 "Admin Fee."

51. The CPC Report further found that these fees are regressive. Because the fee is a fixed dollar amount, it represents a larger share of the price of a modest home than of an expensive one. As an example, the report calculated that, on a $400,000 sale, two $750 fees would raise the effective commission rate by more than a third of a percentage point, and the effect is proportionally greater on the lower-priced homes bought by first-time and working-class buyers.

52. Significantly, these fees are unfair irrespective of whether they are disclosed. Where the fee appears for the first time on the closing statement, the buyer or seller learns of it when it is too late to object. Where the fee appears in the initial agreement, it is presented as a standard, non-negotiable term of a form contract, alongside a percentage commission that already compensates the brokerage generously for every service it provides.

53. Fees of this kind are what state and federal lawmakers have labeled "junk fees." The term describes a mandatory charge, added to the price a consumer has agreed to pay, that corresponds to no additional good or service, is presented under a label that obscures what it is, and is collected at a point in the transaction when the consumer has no practical ability to refuse it.

54. In announcing its rulemaking on junk fees, the Federal Trade Commission reported that consumers complained not only of fees revealed late, but that sellers "often misrepresent or do not adequately disclose the nature or purpose of certain fees, leaving consumers wondering what they are paying for or if they are getting anything at all for the fee charged." The White House Council of Economic Advisers likewise explained that junk fees "harm consumers and actively

undermine competition by making it impractical for consumers to compare prices, a linchpin of our economic system."

55. Tennessee law addresses the same concern. The Tennessee Consumer Protection Act of 1977, Tenn. Code Ann. §§ 47-18-101 *et seq.* (the "TCPA"), is to be liberally construed to protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within Tennessee. Tenn. Code Ann. § 47-18-102. Among the practices the TCPA specifically declares unlawful are representing that goods or services have characteristics, uses, or benefits that they do not have, Tenn. Code Ann. § 47-18-104(b)(5), and representing that a consumer transaction confers or involves rights, remedies, or obligations that it does not have or involve, Tenn. Code Ann. § 47-18-104(b)(12).

56. Defendant's Admin Fee has every feature that makes a fee a junk fee, and it is an unfair and deceptive practice under Tennessee law. It is charged for nothing (Part D). It is charged by a broker to its own client, which Defendant does not even attempt to collect from the seller who customarily pays, and here did pay, broker compensation (Part B). On information and belief, it is imposed as a non-negotiable term, described to buyers as required (Part C), and it is collected from closing funds, when the buyer has contracted to purchase the home, deposited money, and arranged financing, and cannot decline to pay without jeopardizing the purchase. And it is labeled to obscure its nature and to defeat price comparison: a buyer comparing brokerages on the basis of the commission cannot see that Defendant's compensation is really the commission plus a flat fee, and a buyer reviewing the Closing Disclosure finds the fee described as an administrative charge among his own closing costs rather than as additional broker compensation (Part E).

57. The Admin Fee is also regressive and substantially injurious. Because it is a flat fee regardless of price, it falls hardest on the buyers of the least expensive homes, the first-time and working-class buyers for whom a few hundred dollars at closing matters most. Multiplied across the transactions Defendant closes each year, the fee extracts substantial sums annually from Tennessee consumers for no service.

58. Plaintiff and the Class were injured by Defendant's practice and suffered an ascertainable loss of money. Plaintiff paid Defendant $320 that purchased no service, that was presented to him as a legitimate administrative charge when it was not and, on information and belief, as mandatory when it was not, and that the seller customarily would have paid and Defendant never asked the seller to pay. Each Class member likewise paid Defendant the Admin Fee or a similar flat fee under the same circumstances.

59. Plaintiff and the Class face a real and immediate threat of future harm from Defendant's practice. Defendant continues to charge the Admin Fee to the buyers it represents, and, on information and belief, also imposes such fees on sellers. Plaintiff remains a homeowner and a participant in the residential real estate market who may again buy or sell a home in Tennessee, and who cannot know, when comparing brokerages on the basis of their advertised commissions, whether Defendant will again impose a mislabeled flat fee for no service. Many Class members are likewise repeat participants in that market. Absent an injunction, Plaintiff and the Class will be unable to rely on Defendant's representations regarding the nature of its fees and compensation.

**TOLLING OF THE STATUTE OF LIMITATIONS**

60. This action is timely. Under Tenn. Code Ann. § 47-18-110, an action under the TCPA must be brought within one year from a person's discovery of the unlawful act or practice,

and in no event more than five years after the date of the consumer transaction giving rise to the claim. The Class Period is limited to transactions within five years of the filing of this Complaint. Plaintiff's transaction occurred in June 2023, and Plaintiff discovered Defendant's unlawful practice in 2026, less than one year before the filing of this Complaint. To the extent any limitations period would otherwise bar any part of the claims of Plaintiff or any Class member, it has been tolled by Defendant's uniform concealment of the nature of the Admin Fee and by the inability of Plaintiff and the Class, despite reasonable diligence, to discover the facts giving rise to their claims.

61. Defendant concealed the nature and origin of the Admin Fee through the manner in which it was presented. Rather than identifying the fee as additional broker compensation, alongside the seller-paid "Real Estate Commission to Buyer's Agent," Defendant caused the fee to be presented as a borrower-paid "Real Estate Agent Admin Fee," payable to a differently styled payee, among Plaintiff's other closing costs. That presentation, together with the generic label "Admin Fee," obscured from Plaintiff that the charge was an additional payment to his own broker, above and beyond the full commission the seller was paying, for which no service was rendered.

62. Defendant, as Plaintiff's broker, owed Plaintiff duties of loyalty, honesty, and good faith, and therefore had an affirmative duty to disclose the true nature of the Admin Fee. Defendant did not do so. Defendant's silence in the face of that duty, and its affirmative presentation of the fee as an ordinary administrative closing charge, constitute fraudulent concealment.

63. Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of Defendant's tactics, including that the Admin Fee corresponded to no service and was charged on top of the full commission paid by the seller, until he learned of them from counsel in 2026. Nothing on the face of the Closing Disclosure disclosed those facts. On information and

belief, the same is true of every Class member, whose closing documents presented the fee in the same manner.

64. Because Defendant's own conduct prevented Plaintiff and the Class from discovering their claims, Defendant is equitably estopped from relying on any statute of limitations as a defense. Plaintiff further invokes the discovery rule, the doctrine of fraudulent concealment, and the doctrine of equitable estoppel to the full extent applicable under Tennessee law.

## CLASS ACTION ALLEGATIONS

65. Plaintiff brings this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), on behalf of the following class (the "Class"):

> All persons who, during the fullest period allowed by law, (a) were represented by Defendant as buyer's broker in the purchase of residential real property located in Tennessee, and (b) paid Defendant, at closing, a flat-dollar "Admin Fee" or similar fixed fee in addition to a commission, in a transaction in which Defendant also received compensation from the seller or the seller's broker.

66. Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, directors, members, managers, and employees; any entity in which Defendant has a controlling interest; all persons who make a timely election to be excluded from the Class; and the judge to whom this case is assigned and the judge's immediate family.

67. Plaintiff reserves the right to modify or refine the definition of the Class, or to propose subclasses, based on further investigation, before the Court rules on class certification.

68. Federal Rule of Civil Procedure 23 governs whether Plaintiff's claim may proceed as a class action in this Court. To the extent any provision of the TCPA purports to restrict the use of the class-action device to recover damages, that restriction is a procedural rule that does not apply in federal court. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010).

69. Numerosity (Fed. R. Civ. P. 23(a)(1)). The members of the Class are so numerous that joinder of all members is impracticable. The identities of Class members are ascertainable from Defendant's transaction files and closing documents.

70. Commonality (Fed. R. Civ. P. 23(a)(2)). There are questions of law and fact common to the Class, including:

a. Whether Defendant charges its buyer clients a flat fee in addition to its commission as a matter of standard practice;

b. Whether Defendant requires its agents to include the flat fee in every buyer transaction;

c. Whether Defendant provides any service in exchange for the flat fee that is not already compensated by its commission;

d. Whether Defendant makes any effort to have sellers pay the flat fee;

e. Whether Defendant's labeling of the fee as an "Admin Fee" violates Tenn. Code Ann. § 47-18-104(b)(5);

f. Whether Defendant's presentation of the fee as an obligation of the buyer violates Tenn. Code Ann. § 47-18-104(b)(12);

g. Whether Defendant's violations were willful or knowing within the meaning of Tenn. Code Ann. § 47-18-109(a)(3);

h. The proper measure of actual damages; and

i. Whether Plaintiff and the Class are entitled to injunctive relief.

71. Typicality (Fed. R. Civ. P. 23(a)(3)). Plaintiff's claims are typical of the claims of the Class. Plaintiff and every Class member were represented by Defendant as buyer's broker; were charged the same kind of fixed fee; and paid it at closing under the same circumstances. Plaintiff's claims arise from the same practice and rest on the same legal theory as the claims of every other Class member.

72. Adequacy (Fed. R. Civ. P. 23(a)(4)). Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to those of the Class, is committed to

the vigorous prosecution of this action, and has retained counsel experienced in consumer class action litigation who have the resources to prosecute this action to conclusion.

73. Predominance and Superiority (Fed. R. Civ. P. 23(b)(3)). The questions of law and fact common to the Class predominate over any questions affecting only individual members. Defendant's liability turns on a uniform practice: the same fee, under the same label, collected at every closing, for which Defendant renders no service. These issues will be resolved with common proof drawn from Defendant's own records and the testimony of its agents and managers. Damages are readily calculable on a class-wide basis from the same records. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The amount any individual Class member could recover is small in relation to the expense and effort of individual litigation, such that no Class member could feasibly litigate an individual claim. Plaintiff is aware of no other pending litigation concerning this controversy, it is desirable to concentrate the litigation in this forum because Defendant and the transactions at issue are located in Tennessee, and Plaintiff anticipates no difficulty in the management of this action as a class action.

74. Injunctive Relief (Fed. R. Civ. P. 23(b)(2)). Defendant has acted or refused to act on grounds that apply generally to the Class by charging the fee to every buyer client under the same practice, so that final injunctive relief is appropriate respecting the Class as a whole.

## CAUSE OF ACTION

**Violation of the Tennessee Consumer Protection Act of 1977 ("TCPA")**
**Tenn. Code Ann. §§ 47-18-101 et seq.**
**(On behalf of Plaintiff and the Class)**

75. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

76. Plaintiff and each Class member are "consumers," and Defendant is a "person," within the meaning of Tenn. Code Ann. § 47-18-103.

77. Defendant's advertising, offering, and sale of real estate brokerage services, and its collection of compensation for those services in connection with the sale of real property located in Tennessee, constitute "trade," "commerce," and a "consumer transaction" within the meaning of Tenn. Code Ann. § 47-18-103.

78. The TCPA declares unlawful the unfair or deceptive acts or practices enumerated in Tenn. Code Ann. § 47-18-104(b), and provides that "[a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice described in § 47-18-104(b) and declared to be unlawful by this part, may bring an action individually to recover actual damages." Tenn. Code Ann. § 47-18-109(a)(1).

79. Defendant violated Tenn. Code Ann. § 47-18-104(b)(5) by representing to Plaintiff and the Class that the flat charge was a "Real Estate Agent Admin Fee," thereby representing that it paid for administrative services having characteristics, uses, or benefits distinct from, and in addition to, the brokerage services compensated by the commission, when in fact the fee corresponded to no service at all.

80. Defendant violated Tenn. Code Ann. § 47-18-104(b)(12) by representing, through the inclusion of the Admin Fee as a borrower-paid charge in the Closing Disclosure and, on information and belief, through its agents' statements that the fee was required and non-negotiable, that the transactions of Plaintiff and the Class obligated them to pay Defendant a flat fee in addition to the buyer-broker commission paid by the seller, when it did not.

81. Defendant's acts and practices were also unfair and deceptive in that Defendant charged its own clients a flat fee, in addition to the commission paid by the seller, for which it provided no service; made no effort to have the seller pay that fee while collecting the rest of its compensation from the seller; on information and belief, required its agents to include the fee in every buyer transaction and treated it as non-negotiable; imposed the fee through the closing process on consumers who had no practical ability to refuse it; charged its clients for complying with the disclosure and record-keeping obligations Tennessee law places on Defendant itself; and failed to disclose that the fee corresponded to no service not already compensated by the commission the seller was paying. These practices offend the public policy embodied in Tenn. Code Ann. §§ 62-13-403 and 62-13-404, and were likely to mislead a consumer acting reasonably under the circumstances.

82. As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiff and each Class member suffered an ascertainable loss of money in the amount of the flat fee each paid: $320 in Plaintiff's case.

83. Pursuant to Tenn. Code Ann. § 47-18-109(a)(1), Plaintiff and the Class are entitled to recover their actual damages.

84. Defendant's violations were willful and knowing. Defendant designed the fee, set its amount, chose its label, required its agents to include it, and collected it from its own clients while knowing that it corresponded to no service not already compensated by the commission paid by the seller. Plaintiff and the Class are therefore entitled to an award of up to three times their actual damages pursuant to Tenn. Code Ann. § 47-18-109(a)(3).

85. Pursuant to Tenn. Code Ann. § 47-18-109(b), any person affected by a violation of the TCPA may bring an action to obtain a declaratory judgment and to enjoin the person who has

violated, is violating, or is otherwise likely to violate the TCPA, and upon a finding of a willful or knowing violation the Court may provide such other relief as it considers necessary and proper, Tenn. Code Ann. § 47-18-109(a)(3). Plaintiff, on behalf of himself and the Class, seeks a permanent injunction prohibiting Defendant from charging Plaintiff and the Class the Admin Fee or any similar flat fee for which no service is rendered in addition to a commission, from mislabeling any such fee on closing documents, and from representing to any buyer that any such fee is required.

86. Plaintiff and the Class have no adequate remedy at law for the future harm described above, because the recovery of a single past fee cannot prevent Defendant from again imposing a mislabeled flat fee in a future transaction, and the balance of hardships and the public interest in honest and transparent pricing in the residential real estate market favor injunctive relief.

87. Pursuant to Tenn. Code Ann. § 47-18-109(e)(1), Plaintiff and the Class are entitled to an award of reasonable attorney's fees and costs.

88. Pursuant to Tenn. Code Ann. § 47-18-109(f)(1), the clerk of the court is to mail a copy of this Complaint to the Tennessee Attorney General and Reporter. Plaintiff is serving a copy of this Complaint on the Tennessee Attorney General and Reporter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Wayne Bettencourt, individually and on behalf of the Class, respectfully requests that the Court enter judgment in his favor and in favor of the Class and against Defendant Benchmark Realty, LLC, and grant the following relief:

A. An order certifying this action as a class action under Federal Rule of Civil Procedure 23, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. A permanent injunction, pursuant to Tenn. Code Ann. § 47-18-109(b), prohibiting Defendant from charging an "Admin Fee" or any similar flat fee, in addition to a

commission, for which no service is rendered; from mislabeling or misdescribing any such fee on closing documents; and from representing to any buyer that such a fee is required;

C. Actual damages pursuant to Tenn. Code Ann. § 47-18-109(a)(1), in an amount to be proven at trial;

D. Treble damages pursuant to Tenn. Code Ann. § 47-18-109(a)(3);

E. Reasonable attorney's fees and costs pursuant to Tenn. Code Ann. § 47-18-109(e)(1);

F. Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

G. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff, individually and on behalf of the Class, demands a trial by jury on all issues so triable.

Dated: November 4, 2026

Respectfully submitted,

**SHAMIS & GENTILE, P.A.**

*/s/ Andrew Shamis*
Andrew Shamis, Esq.
14 NE 1st Avenue, Suite 705
Miami, FL 33132
Telephone: (305) 479-2299
ashamis@shamisgentile.com

*Counsel for Plaintiff and the Putative Class*